IN THE SUPREME COURT OF TENNESSEE
SPECIAL WORKERS' COMPENSATION APPEALS PANEL
AT JACKSON
JANUARY 16, 2004 Session

# DAVID STUPP, ET AL. v. PHILLIPS AUTO BODY, LLC AND FIRST AMERICAN INSURANCE COMPANY, ET AL.

**Direct Appeal from the Chancery Court for Shelby County**
**No. CH-01-1774-1      Walter L. Evans,  Chancellor**

---

**No. W2003-00825-SC-WCM-CV- Mailed September 2, 2004; Filed November 30, 2004**

---

This workers' compensation appeal has been referred to the Special Workers' Compensation Appeals Panel of the Supreme Court in accordance with *Tennessee Code Annotated Section 50-6-225(e)(3)* for hearing and reporting to the Supreme Court of findings of fact and conclusions of law.  The trial court determined that the plaintiff sustained a 25% vocational impairment to the body as a whole.  The defendant asserts that: 1)  the plaintiff failed to carry his burden of proof of permanent injury; 2) the trial court erred in finding plaintiff had an operative disk lesion which necessitated surgery; 3) the trial court erred in not granting defendant's motion for additional facts or to amend judgement; and 4) the trial court erred in finding that Dr. Anthony Segal's charges were reasonable and necessary and in granting plaintiff's motion for discretionary costs.  Plaintiff asserts that the trial court erred when it awarded plaintiff a 25% disability impairment to the body as a whole, urging that the award should have been higher.  We agree with the position of the plaintiff, and for the reasons set forth below, we modify the judgment of the trial court to award a forty-five percent (45%) vocational disability to the body as a whole.

**Tenn. Code Ann. § 50-6-225(e) (1999) Appeal as of Right;**
**Judgment of the Chancery Court Affirmed as Modified**

JAMES F. BUTLER, SP. J., delivered the opinion of the Court, in which JANICE M. HOLDER, J., and JAMES L. WEATHERFORD, SR. J., joined.

Richard W. Vaughn, Jr., Milan Tennessee, for the appellants, Phillips Auto Body, LLC and First American Insurance Company.

David G. Mills, Cordova, Tennessee, for the appellee, David Stupp.

# MEMORANDUM OPINION

Plaintiff was, at time of trial, 38 years old, married with four children, and attended school to the 11th grade. Plaintiff was employed as an auto body frame technician at Phillips Auto Body, LLC. The company was owned by Mary and Lou Phillips who also worked there. Plaintiff's duties consisted of vehicle body and frame work. At the time of his injury he was working in the shop on a pickup truck.

Plaintiff alleges that on July 10, 2001, Plaintiff and a co-worker, Scott Taylor, were lifting the hood off of a pickup truck when Plaintiff sustained an injury to his neck. He notified Lou Phillips immediately. Plaintiff worked the remainder of the day on light duty.

The next day Plaintiff still had pain and went to Baptist Minor Medical and then to Campbell Clinic. He was seen by Dr. Douglas Linville at the Campbell Clinic who sent him to physical therapy and prescribed medication. He returned to work the next day. On July 17th, 2001, Plaintiff went to physical therapy and returned to work. A discussion ensued between Plaintiff and Mary Phillips because she thought he had been gone longer than she expected, and Plaintiff was terminated that day.

Plaintiff continued his physical therapy after termination and was referred to Dr. Ashley Park, also at the Campbell Clinic. Dr. Park ordered an MRI and injected Plaintiff with two steroid blocks. He was then referred to Dr. John Brophy and ultimately retrieved his medical records from Campbell Clinic. His medical records contained a comment about a previous lawsuit and that the Plaintiff had been videotaped "popping wheelies" on a four-wheeler.

Dr. Brophy reviewed the MRI and found cervical spondylosis, worse on the left at C5-6 and C6-7, without definite evidence of nerve root or spinal cord compression. Wanting to rule out nerve root compression, he ordered a myelogram/CT scan and later ordered a bilateral upper extremity EMG/nerve conduction study. After reviewing these studies, according to Plaintiff, Dr. Brophy told him that he did not hurt himself at work, that there was nothing wrong with him, and that he should go back to work immediately. Plaintiff thereafter sought the services of Dr. Anthony Segal, a neurosurgeon and provided him with his MRI for review. Dr. Segal ultimately performed surgery on the Plaintiff. After his recovery period, he went back to work for the same company which was under new ownership. At trial, Plaintiff was doing the same work that he was doing prior to his injury with the exception of the heavy lifting.

## Medical Evidence

Dr. John Brophy initially saw the Plaintiff on March 11, 2002. He reviewed the Plaintiff's MRI and opined that Plaintiff had cervical spondylosis, worse on the left at C-5-6 and C-6-7, without definite evidence of nerve root or spinal cord compression. Based on Plaintiff's severity of pain, Dr. Brophy ordered a cervical myelogram/CT scan to rule out nerve root compression. His plan was that if the myelogram demonstrated evidence of nerve root compression, they would discuss surgery. If

not, they would discuss Plaintiff's return to work. Dr. Brophy reasoned that the only reason to do surgery would be to remove pressure from the nerve. Since there are many causes of pain in the neck and arm other than pressure on a nerve, he wanted to verify the nerve pressure. He opined that the myelogram is the "gold standard" to determine nerve root pressure. The myelogram/CT scan was performed and there was still no definite evidence of a herniated disk or nerve root compression. Because of Plaintiff's continued complaints of bilateral upper extremity pain, Dr. Brophy recommended an EMG/nerve conduction study. This study was within normal limits. Although Plaintiff still described pain bilaterally, Dr. Brophy, based on evidence he had before him, cleared Plaintiff to return to work without restrictions on April 16, 2002, with a permanent partial impairment rating of zero. Dr. Brophy stated that generally if there is a significant disk herniation, it is obvious, but at other times the findings are less obvious, and Plaintiff was in that category. On the subject of justification for surgery, Dr. Brophy stated:

Dr. Brophy's deposition, pages 12-13:

QUESTION: Okay. Going back to the March 15th visit, would you have–based only on the review of the MRI, would you have recommended surgery without the myelogram CAT scan?

ANSWER: No.

QUESTION: And why not, Doctor?

ANSWER: Because his primary symptoms and clinical examination at that time did not fit the abnormalities on the MRI, and ...there was not definitive evidence of nerve root compression, which is the primary issue that I am operating on.

QUESTION: And you came to the same conclusion after reviewing the myelogram and CAT scan that you ordered?

ANSWER: Yes.

Dr. Brophy's deposition, pages 20-21:

QUESTION: Okay. And one thing that Dr. Segal pointed out is when he presented himself to Dr. Segal, by then his arm pain was almost exclusively left arm pain, which from Dr. Segal's point of view I would think was very consistent with having an MRI that showed a bulging disc on the left?

ANSWER: Potentially, yes.

-3-

QUESTION: Potentially. So without having— Dr. Segal didn't have the CAT scans and the myelograms that you had, and from his point of view he had an MRI that showed left arm–or left disc--a disc on the left side and then left arm pain that was consistent, so he went ahead and did surgery. Was that—based on that, that seemed like a reasonable thing to do, wouldn't you say?

ANSWER: Again, it depends on the presentation, exact description of the pain, what did the exam show. Potentially it could have fit. And, of course, the real barometer to answer that question is how did he do post-op.

QUESTION: And if he did well - - very well post op, that would be indicative that there was some impingement on that nerve running down his left arm?

ANSWER: Yes.

Dr. Brophy's deposition, page 26:

QUESTION: Well, is the best evidence that he had compression on the nerve the fact that after the surgery is over and a fusion is done he is not having arm pain anymore?

ANSWER: Yes.

Dr. Brophy previously rated the Plaintiff at 0% permanent partial impairment with no restrictions. However, he did state that had he done a one level anterior cervical diskectomy and fusion on the Plaintiff, his rating would have been 10% based on the AMA Guides.

Plaintiff retrieved his medical records from Dr. Brophy, including the MRI and myelogram/CT scan and sought a second opinion from Dr. Anthony Segal, a neurosurgeon. Dr. Segal saw the Plaintiff initially on April 18, 2002. He reviewed the MRI, but Plaintiff purposely did not provide Dr. Segal with the myelogram/CT scan or any of Dr. Brophy's records. Dr. Segal noted that the MRI showed two disk lesions, one very small between the C-6 and C-7 which he felt was insignificant, and one between C-5 and C-6 with some bony spur and with some compression of the cord and the nerve on the left side. He continued conservative treatment of the Plaintiff and suggested Plaintiff try to return to work. Plaintiff returned to work for about three days, but had to stop because of pain. In May 2002, Plaintiff returned to Dr. Segal with left arm and left shoulder blade and shoulder pain. Dr. Segal suggested surgery on one level between C-5 and C-6 and a fusion. The surgery was performed on May 31, 2002. During surgery, Dr. Segal noted that the Plaintiff's posterior longitudinal ligament appeared to have been stretched for at least six months,

-4-

which indicated to him that Plaintiff had a long-standing disk problem. He stated this condition will not show up on an MRI, a CT scan, a myelogram or EMG.

After surgery, the Plaintiff did well. After a recovery period, Plaintiff returned to work. Dr. Segal opined the Plaintiff's accident at work caused the herniated disk that he saw and rated his anatomical impairment at 25% to the whole body in accordance with the AMA Guides. He stated that prior to his testimony he had not seen the myelogram, the post myelogram CT scan, or the EMG/ nerve conduction study. He stated that had he seen them, and they were normal, it was possible he would have thought longer and harder and may not have done the surgery. But given the results, it worked out better for the Plaintiff, according to Dr. Segal.

## Standard of Review

Appellate review is de novo upon the record of the trial court, accompanied by a presumption of the correctness of the findings of facts, unless the preponderance of the evidence is otherwise. *Tenn. Code. Ann. § 50-6-225(e)(2) (Supp. 2002).* The reviewing court is required to conduct an independent examination of the record to determine where the preponderance of the evidence lies. *Wingert v. Government of Sumner County, 908 S.W.2d 921, 922 (Tenn. 1995).* The standard governing appellate review of findings of fact by a trial court requires the Special Workers' Compensation Panel to examine in depth a trial court's factual findings and conclusions. *GAF Bldg. Materials v. George, 47 S.W.3d 430, 432 (Tenn. 2001).* The trial court's findings with respect to credibility and weight of the evidence may generally be inferred from the manner in which the court resolves conflicts in the testimony and decides the case. *Tobitt v. Bridgestone/Firestone, Inc., 59 S.W.3d 57, 61 (Tenn. 2001).* Where the trial court has seen and heard witnesses, especially where the issues of credibility and weight of oral testimony are involved, considerable deference must be accorded the trial court's factual findings. *Humphrey v. David Witherspoon, Inc., 734 S.W. 2d 315 (Tenn. 1987).* The extent of an injured worker's vocational disability is a question of fact. *Seals v. England/Corsair Upholstery Mfg. Co., 984 S.W.2d 912, 915 (Tenn. 1999).*

As to the first three issues raised by the Defendant, the Court feels that they are interrelated and we will deal with them as such.

**1. Whether the Plaintiff failed to carry his burden of proof in establishing that he suffered a permanent injury on July 10, 2001, and that he had an operative disk lesion which necessitated surgery.**

In order to be eligible for workers compensation benefits, an employee must suffer "an injury by accident arising out of and in the course of employment which causes either disablement or death." *Tenn. Code Ann. § 50-6-102 (12).* The phrase "arising out of" refers to causation. The causation requirement is satisfied if the injury has a rational, causal connection to the work. *Reeser v. Yellow Freight Systems, Inc., 938 S.W.2d 690,692 (Tenn. 1997).* Although causation cannot be based upon merely speculative or conjectural proof, absolute certainty is not required. Any reasonable doubt in this regard is to be construed in favor of the employee. We have thus

consistently held that an award may properly be based upon medical testimony to the effect that a given incident "could be" the cause of the employee's injury, when there is also lay testimony from which it reasonably may be inferred that the incident was in fact the cause of the injury. *Id.*

It is well settled in this state that a plaintiff in a workers' compensation case has the burden of proving every element of this case by a preponderance of the evidence. *Elmore v. Travelers Ins. Co.*, *824 S.W.2d 541, 543 (Tenn. 1992).* Medical causation and permanency of an injury must be established in most cases by expert medical testimony. *See, e.g.*, *Thomas v. Aetna Life & Cas. Co., 812 S.W.2d 278, 283 (Tenn. 1991).* With these principles in mind, we review the record to determine whether the evidence preponderates against the findings of the trial court.

Plaintiff testified that he injured himself on July 10, 2001, while he and a co-worker, Scott Taylor, were lifting a hood off a pick-up truck when both were employed with Phillips Auto Body, LLC. This incident was confirmed by Scott Taylor in his testimony and the employee's accident report on July 11, 2001. The Plaintiff immediately notified one of the owners of the shop, Lou Phillips. He was put on light duty for the balance of the work day. Plaintiff sought medical treatment the next day for which the employer paid. The trial judge made a finding of fact that the Plaintiff sustained an injury to his neck and arms while on the premises of his employer, while lifting the hood of a pick-up truck.

Plaintiff initially saw Dr. Linville whose records indicate symptoms of radiculapathy consistent with nerve root compression between C5-6 on the right side. Dr. Ashley Park's records indicate he felt Plaintiff may have suffered a cervical disk injury. Dr. Park ordered the MRI which indicated a central disk protrusion at C5 and a posterior disk protrusion at C6. Dr. Park's medical records contain a note that information from the claims adjuster states that Plaintiff was videotaped "popping wheelies" on a four wheeler with a child on the back and that the adjuster was concerned that since he had already gotten a settlement for his lumbar spine ($80,000.00) he is headed the same way with his neck.

After being treated by Drs. Linville and Park, Plaintiff was referred to Dr. Brophy, a neurosurgeon. Dr. Brophy, after extensive testing, opined that the Plaintiff's injury was not permanent, and released him to go back to work with a zero impairment rating. He based this opinion primarily on his belief that there was no definite evidence of cord or nerve root compression which would justify doing surgery. While Dr. Brophy stated his opinion that the myelogram was the "gold standard" to determine nerve root pressure, he did state also that the real barometer to answer that question is how the patient did after the operation.

Dr. Segal initially saw Plaintiff on April 18, 2002, and reviewed the medical records of Drs. Linville and Park at the Campbell Clinic. He also reviewed the Plaintiff's MRI, but did not have the myelogram/CT scan or EMG performed while Plaintiff was under Dr. Brophy's care. Dr. Segal diagnosed a C5-6 disk lesion and after conservative treatment failed to provide relief to the Plaintiff, Dr. Segal performed an anterior cervical diskectomy and fusion of C5 and C6. During surgery, Dr. Segal discovered a "floppy" ligament that had been stretched by the disk. This indicates the ligament

had been stretched for at least six months. In his opinion this was further verification of his initial diagnosis of a disk lesion. After a recovery period, Plaintiff's pain was gone and he returned to work.

Dr. Segal opined that Plaintiff had suffered a twenty-five percent (25%) impairment to the whole body based on the AMA Guides. Dr. Segal explained that sometimes a disk herniation is dramatic and obvious and that the surgeon can clearly see the pressure has been removed from the nerve and that had to have been the source of the problem. There are other times when the findings are less impressive and less obvious, and Plaintiff fell into this later category.

Dr. Brophy and Dr. Segal disagreed concerning the significance of the Plaintiff's "floppy ligament." Dr. Brophy said that the presence of a floppy ligament had no significance as to a herniation. Dr. Segal stated that it indicated a disk that had been herniated for at least six months. They also disagreed concerning the importance of the myelogram/CT scan and EMG in diagnosing the disk lesion. Dr. Brophy said the myelogram was the "gold standard." Dr. Segal said it is not the myelogram which is most specific, but the CAT scan after the myelogram. The CT scan after the dye has been put in place is slightly more accurate than the MRI, but only about one (1) or two (2) percent difference, particularly in somebody young like the Plaintiff. Dr. Segal did not think the post myelogram CT has much to offer, nor did he think that the EMG nerve conduction study would show that much in the case of a surgical disk.

When faced, as in the case before us, with conflicting medical testimony on these issues, "it is within the discretion of the trial judge to conclude that the opinion of certain experts should be accepted over that of other experts and that it contains the more probable explanation." *Hinson v. Wal-Mart Stores, Inc.*, 654 S.W.2d 675, 676-77 (Tenn. 1983) (citing *Combustion Engineering, Inc. v. Kennedy*, 562 S.W.2d 202 (Tenn. 1978)). It should be noted that the rule set out in *Hinson* remains valid even though *Hinson* was decided under the "material evidence" standard of review.

In light of the foregoing evidence, we are persuaded that there is ample evidence in the record to support the trial court's finding that the Plaintiff carried his burden of proof in establishing that he suffered a permanent injury on July 10, 2001, and that he had an operative disk lesion which necessitated surgery. We therefore affirm the trial court's findings in this regard.

**2. Whether the trial court erred in awarding unpaid medical expenses to Plaintiff because Plaintiff failed to request authorization of the Defendant for the treatment by Dr. Segal.**

Tennessee Code Annotated Section 50-6-204 (a)(4)(A) provides that the employer shall furnish such medical care as is reasonably required for a compensable injury and that:

> (4) The injured employee shall accept the medical benefits afforded
> hereunder; provided that the employer shall designate a group of three
> (3) or more reputable physicians or surgeons not associated together

in practice, if available in that community, from which the injured employee shall have the privilege of selecting the operating surgeon or attending physician.

After being sent to Dr. Brophy, and not receiving any relief, Plaintiff desired a second opinion. He informed Dr. Brophy of this request, and Dr. Brophy provided Plaintiff with his test results. Plaintiff was referred to Dr. Segal by his regular physician for other unrelated complaints. Since these complaints had resolved themselves before his appointment, Plaintiff decided to use the appointment to discuss his work injury. On his first visit, he provided Dr. Segal with the August 2001 MRI and the records of Dr. Linville and Dr. Park. He intentionally withheld the myelogram/CT scan and EMG studies given to him by Dr. Brophy. Plaintiff did not seek authorization from Defendant for the treatment rendered to him by Dr. Segal.

Plaintiff indicated that he withheld all references to Dr. Brophy because he did not trust Dr. Brophy. When he initially saw Dr. Brophy he was informed that his case worker had already been there talking to Dr. Brophy for about a half an hour. This was apparently the same case worker who had informed the Plaintiff's previous doctor that Plaintiff had been "popping wheelies on a four-wheeler." This information later at trial was proven to be false. Plaintiff felt that Dr. Brophy was short with him and seemed to have an "attitude" with him.

Plaintiff had experienced difficulties with the Defendant's insurance carrier and the Defendant. Defendant had terminated Plaintiff shortly after the injury. Plaintiff's claim for workers' compensation benefits was denied. Plaintiff had to file suit to obtain his temporary benefits. Defendant had a private investigator videotaping the Plaintiff but who was also videotaping Plaintiff's brother by mistake. It was Plaintiff's brother who was videotaped riding the four-wheeler.

From a review of all the medical and lay testimony, the Panel is persuaded that if Plaintiff had taken Dr. Brophy's advice and not had surgery, he may have not been able to return to work. By seeking a second opinion and ultimately having surgery, Plaintiff was at trial time back at work and doing well.

The trial court has authority to order that the employer pay for unauthorized medical care if the employee fails to consult the employer beforehand when the circumstances warrant such an Order. The Court has stated the following proposition:

> Whether an employee is justified in seeking additional medical services to be paid for by the employer, without consulting the employer, depends on the circumstances of each case. *Bazner v. American States Ins. Co.,* 820 S.W.2d 742, 746 (Tenn.1991); *see also Dorris v. INA Ins. Co.,* 764 S.W.2d 538, 540-41 (Tenn. 1989).

The trial court found that Dr. Segal's surgery and related expenses were all paid for by TennCare, Plaintiff's health insurance carrier. Since the trial court ordered Defendant to reimburse

TennCare for its cost of the surgery by Dr. Segal, the trial court evidently believed that the proof supported such payments. The trial court's findings on this issue are as follows:

> The treatment rendered to the Plaintiff by Dr. Anthony Segal and the expenses incurred from Dr. Segal, Saint Francis Hospital, and all other providers in relation to the surgery were reasonable and necessary as a result of said injury.
>
> TennCare must be reimbursed by the Defendant, First American Insurance Company, for any and all medical expenses paid on behalf of the Plaintiff, David Stupp, to Dr. Anthony Degal, Saint Francis Hospital, and all other providers in relation to the surgery.

The trial court heard the testimony of Plaintiff, viewed the videotapes of the defendant and his brother, and apparently credited the Plaintiff's testimony that he had reason to distrust Dr. Brophy under the totality of the circumstances.

From our analysis of the record, we cannot find that the evidence preponderates against the trial court's determination that the expenses related to Dr. Segal's surgery were reasonable and necessary as a result of the injury. Accordingly, we affirm the trial court's ruling that the expenses for Dr. Segal's surgery were reasonable and necessary.

**3. Whether the evidence preponderates against the trial court's finding that Plaintiff retains a twenty-five percent (25%) disability impairment to the body as a whole.**

The extent of vocational disability is a question of fact to be determined from all of the evidence, including lay and expert testimony. *Worthington v. Modine Mfg. Co.*, *798 S.W.2d 232, 234 (Tenn. 1990).* In making determinations of vocational disability, the court shall consider all pertinent factors, including lay and expert testimony, employee's age, education, skills and training, local job opportunities, and capacity to work at types of employment available in claimant's disabled condition. *Tenn. Code Ann. § 50-6-241 (a)(1); Roberson v. Loretto Casket Co., 722 S.W.2d 380, 384 (Tenn. 1986).*

In this case, the medical proof provided the following anatomical impairment ratings to the body as a whole: 1) Dr. Segal assigned a twenty-five percent (25%) impairment rating; 2) Dr. Brophy assigned a zero percent (0%) impairment rating, but also said that if he had performed the same surgery that Dr. Segal had performed on Plaintiff, his rating would have been ten percent (10%). Dr. Segal stated that according to the AMA Guides, Plaintiff must be rated under the DRE method. He stated this is the first injury at one level, and for fusion, which gives him loss of motion segment integrity, he gets a permanent partial impairment rating of twenty-five percent (25%) to the body as a whole. Dr. Brophy acknowledged the example in the Guides referred to by Dr. Segal that rates a patient who had a fusion and did well at twenty-five percent (25%). However, he opined that the AMA Guides contradict themselves as to the ratings given for surgery of this nature and that his

standard rating for a surgery such as the Plaintiff's was ten percent (10%). Dr. Brophy stated that he used the range of motion method which is appropriate in a two-level surgery. Under this rating method, the range of motion must be actually tested. Dr. Brophy did not actually test Plaintiff's range of motion because he never saw Plaintiff after his surgery. Dr. Brophy rated Plaintiff with an eight percent (8%) impairment for the surgery and an additional two percent (2%) for a range of motion which he described as "generous."

The trial court made a finding that there was nothing in the record to indicate to a reasonable degree of medical certainty whether Dr. Brophy's two percent (2%) rating for a loss of range of motion is indeed "generous," equitable, or overly conservative. Plaintiff testified, and the trial court found, that the Plaintiff demonstrated some loss of range of motion in bending his neck forwards, extending his neck backwards, and tilting his head from side to side. The court further found that Plaintiff was unable to lift the heavy car parts that he lifted prior to his injury. Scott Taylor, Plaintiff's co-worker at the time of his injury and at the time that he returned to work for his new employer, testified that prior to the Plaintiff's injury, Plaintiff did heavy work, but that after the injury he did not see Plaintiff do any heavy work. Plaintiff testified that being a frame technician can be a heavy lifting job, requiring the lifting of doors, tailgates, beds on trucks, hoods and anything heavy on a car that comes off. Plaintiff testified that he operates two frame machines now in his current job, but has helpers that go from one machine to the other to do the things that he is not able to do. Plaintiff testified that he no longer does any heavy lifting for his new employer. He stated that he gets help from co-workers to do heavy lifting required in his work. Plaintiff stated that if he lost his current job as a "frame man," he would have to find someone who would employ him under the same circumstances, and that he had never seen a job like that. Plaintiff's work history is one of manual labor involving heavy lifting. Plaintiff was 38 years old at the time of trial and was educated to the eleventh grade. Plaintiff was terminated by his employer shortly after the injury occurred and did not return to work with his pre-injury employer.

It is well settled that a claimant's anatomical disability rating is but one factor in considering the extent of vocational disability. *Roark v. Liberty Mutual Ins. Co., 793 S.W.2d 932, 934*. Plaintiff's own assessment of his physical condition is competent testimony and cannot be disregarded. *Tom Still Transfer Co. v. Way, 482 S.W.2d 775,777 (Tenn. 1972); Walker v. Saturn Corp., 986 S.W.2d 204, 208 (Tenn. 1998).*

Here the Plaintiff is 38 years old, has an eleventh grade education and a job history of manual labor as an autobody frame technician. While Plaintiff has returned to work, he is now unable to lift the heavy car parts that he lifted prior to his injury. He currently has helpers to do the things he is not able to do. He no longer does any heavy lifting for his new employer. Plaintiff testified that if he lost his job as a "frame man" he would have to find another employer who would employ him under these same circumstances. Plaintiff testified that he does not know of a job like that.

An examination of these factors preponderates in favor of an increase in the trial court's assessment of vocational disability and in favor of a finding of forty-five percent (45%) permanent partial disability to the whole body.

## CONCLUSION

We hold that the evidence preponderates against the trial court's assessment of a twenty-five percent (25%) vocational disability rating to the Plaintiff's body as a whole. After consideration of all the appropriate factors, we modify the judgement of the trial court and award a forty-five percent (45%) vocational disability to the body as a whole. As modified, the judgment is affirmed. Costs are assessed to the Appellants, Phillips Autobody, LLC and First American Insurance Company, for which execution may issue if necessary.

_____
JAMES F. BUTLER, SPECIAL JUDGE

# IN THE SUPREME COURT OF TENNESSEE
## AT JACKSON

## DAVID STUPP, et al, v. PHILLIPS AUTO BODY, LLC & FIRST AMERICAN INSURANCE COMPANY, et al

---

### No. W2003-00825-SC-WCM-CV - Filed November 30, 2004

---

### ORDER

This case is before the Court upon motion for review pursuant to Tenn. Code Ann. § 50-6-225(e)(5)(B), the entire record, including the order of referral to the Special Workers' Compensation Appeals Panel, and the Panel's Memorandum Opinion setting forth its findings of fact and conclusions of law, which are incorporated herein by reference;

Whereupon, it appears to the Court that the motion for review is not well-taken and should be denied and

It is, therefore, ordered that the Panel's findings of fact and conclusions of law are adopted and affirmed, and the decision of the Panel is made the judgment of the Court.

Costs on appeal are taxed to the Appellants, Phillips Auto Body, LLC, and First American Insurance Company.

IT IS SO ORDERED this 30th day of November, 2004.

PER CURIAM

Holder, J. - not participating.