# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs May 1, 2001

# MARGARET TOBITT v. BRIDGESTONE/FIRESTONE, INC.

**Appeal by Permission from the Supreme Court**
**Special Workers' Compensation Appeals Panel**
**Circuit Court for Warren County**
**No. 9351      Hon. Charles D. Haston, Judge**

---

**No. M2000-00279-SC-WCM-CV - Filed August 29, 2001**

---

In this workers' compensation case, the employer, Bridgestone/Firestone, Inc., has appealed from a judgment of the Circuit Court of Warren County awarding the employee, Margaret Tobitt, fifty percent permanent partial disability benefits to the body as a whole, with twenty percent of the award commuted to a lump sum. The trial court found that the employee suffered an aggravation of a pre-existing jaw condition after she was struck by a car while walking through the employer's parking lot. The employer appealed, arguing that (1) the employee failed to prove that she suffered an injury arising out of her employment, (2) the trial court incorrectly combined the employee's medical impairment ratings, and (3) the award of fifty percent was excessive. The Special Workers' Compensation Appeals Panel, upon reference for findings of fact and conclusions of law pursuant to Tenn. Code Ann. §50-6-225(e)(3), found that there was insufficient evidence of causation to warrant an award of benefits and thus reversed the trial court's judgment. Thereafter, the employee filed a motion for full Court review of the Panel's decision pursuant to Tenn. Code Ann. §50-6-225(e)(5)(B). We granted the motion to consider whether the evidence preponderates against the trial court's finding that the employee's injury arose out of her employment. After carefully examining the record and considering the relevant authorities, we agree with the trial court's finding that the employee established a causal connection between her injury and being struck by the car. Accordingly, the trial court's judgment is affirmed.[1]

**Tenn. Code Ann. §50-6-225(e); Findings of Fact and Conclusions of Law by Special Workers' Compensation Appeals Panel Reversed; Judgment of the Circuit Court Affirmed**

---

[1]Although the issues concerning the employee's impairment ratings and the extent of her disability were not reached by the Panel, we find that the trial court properly resolved these questions. Moreover, we find that the evidence does not preponderate against the trial court's decision to commute only twenty percent of the award to a lump sum.

FRANK F. DROWOTA, III, delivered the opinion of the court, in which JANICE M. HOLDER, and WILLIAM M. BARKER, JJ, joined. E. RILEY ANDERSON, C. J., filed a dissenting opinion. ADOLPHO A. BIRCH JR., J. not participating.

B. Timothy Pirtle, McMinnville, Tennessee, for the appellant, Bridgestone/Firestone, Inc.

John L. Norris, Nashville, Tennessee, for the appellee, Margaret Tobitt.


**OPINION**

**Background**

Margaret Tobitt ("employee") was employed by Bridgestone/Firestone, Inc. ("employer") in its plant as an operating technician. The employee suffered from problems related to her temporomandibular joints ("TMJ"), which were not work-related, such as jaw pain, an inability to completely open her mouth, and clenching and grinding her teeth. Her treating oral and maxillofacial surgeon, Dr. Anthony Urbanek, performed surgery in May 1995 to remove the disks from the jaw joints on both sides of her face. According to Dr. Urbanek, the employee was doing "reasonably well" following the surgery and her pain had diminished by fifty percent as of October 1995. Dr. Urbanek believed that the employee's prognosis was good and that she would eventually return to work without significant pain. According to the employee, she "was doing fine" in the months following the May 1995 surgery.

On November 8, 1995, the employee was leaving work when she was struck by a car on the employer's property. She was walking to the employee parking lot after her shift ended when the car hit her in the knees, knocking her to the ground. She felt pain in her knee and wrist and her "head hurt instantly." Susan Peterson, a co-worker who was walking with the employee at the time of the accident, saw her lying on the pavement with her head against a curb.

The employee was treated at the scene by paramedics. One of the paramedics, Brian Raymond, testified that the employee had no loss of consciousness, was awake, alert, and in no acute distress. He stated that the employee complained of pain in her wrist and knee and that he applied splints to her arm and leg. A cervical collar was placed on the employee's neck, which required Raymond to manipulate her head and jaw. Raymond's report did not reflect any complaints by the employee regarding her head or jaw. According to Raymond, her "head and neck were within normal limits."

The employee was taken to a hospital where she was treated for wrist and knee injuries. The employee testified that while in the emergency room she mentioned "several times" that she was having pain in her head. At one point she asked a nurse, "what about my head?" Elizabeth Maynard, a co-worker who was with the employee in the emergency room, corroborated the

employee's testimony that she asked a nurse about the pain in her head. Maynard also testified that she, Maynard, asked the employee how her knee was doing and the employee responded, "my knee is fine, my head is killing me." The emergency room records indicate that the employee was treated for pain in her arm and knee, but no other complaints were noted. Kristin Stallard, the nurse who signed the emergency room report, had no independent recollection of the employee. The nurse who actually treated the employee did not testify.

On the day after the accident, the employee's head "felt like it was a pumpkin. It just throbbed, and it felt so big." The employee testified, "my whole head was just killing me." She described the pain to a nurse at the employer's plant and obtained permission to see Dr. Urbanek. On November 10, 1995, two days after the accident, the employee returned to Dr. Urbanek and explained that she had been hit by a car and was having severe headaches and jaw soreness. An x-ray was performed which Dr. Urbanek believed revealed a fracture of the condyle (the ball of the jaw joint). He placed the employee on pain medication and ordered a CT scan, which did not reveal a fracture. When the employee's pain failed to subside following conservative treatment, Dr. Urbanek wired her jaw shut, but the pain continued. Dr. Urbanek then performed exploratory surgery on the employee's jaw and inserted a metal replacement for the disk that had been previously removed. Dr. Urbanek did not observe any fractures during this surgery, although he testified that the employee's symptoms "were consistent with damage of some kind consistent with a fracture." Despite the negative diagnostic test results, he maintained both at the time he treated the employee and at the time he testified that the employee did have a fracture of the condyle caused by the accident. According to Dr. Urbanek, the employee's symptoms "were consistent with additional injury to her [jaw] joint."

After the surgery performed by Dr. Urbanek, the employee continued to have pain in her jaw. In addition, nerve damage caused by the surgery caused her mouth to droop and left her unable to close her right eye or lift her eyebrow. The employee's face looked like she had a stroke, and she had to tape her right eye shut. She could not blink and had difficulty eating.

The employee was referred to Dr. Samuel McKenna, an oral and maxillofacial surgeon, to address her continuing pain and the nerve damage caused by the most recent surgery. Dr. McKenna operated on the employee in September 1996 and again in February 1998 in an effort to eliminate the employee's pain and correct her facial symptoms. Although these surgeries helped with the symptoms, the employee continued to have pain. Dr. McKenna opined, based on the history given to him by the employee, that there was an injury to the jaw joint from the car accident and that the second surgery performed by Dr. Urbanek was required as a result of that accident. Like Dr. Urbanek, his impression was that the employee had fractured her lower jaw. According to Dr. McKenna, a fracture "would speak some to the magnitude of the trauma . . . but it's still possible to injure the joint without a fracture." Dr. McKenna released the employee to return to work under instructions to avoid any trauma to her face and jaw, avoid working in a hard-hat environment, and avoid exposure to vibrations. He assessed ten percent impairment to the whole body for the jaw injury resulting from the car accident. This impairment rating did not take into account the damage to the employee's facial nerves.

The employee also saw Dr. Debra Sherman, an ophthalmic plastic surgeon. Dr. Sherman performed two surgeries to improve the employee's ability to close her eye and the position of her eyebrow. Dr. Sherman was unable to repair the employee's involuntary blink function and, therefore, she continues to suffer blurred vision and dryness in her right eye. Also, she is unable to move the muscles that control her eyebrow and forehead. Dr. Sherman assessed a ten percent impairment rating based on the damage to the employee's facial nerves, but this rating did not take into account the impairment related to her jaw.

Aside from the medical proof, there was considerable testimony about the adverse effect of the employee's injury on her job performance. Co-workers of the employee testified that prior to the accident she had a great attitude and was a hard worker in an environment where the work was hot, heavy, and involved long hours. After the accident, however, the employee has had a difficult time at work. She has had trouble performing some of her duties and has had problems with co-workers complaining that she was not "pulling her full load on the floor," particularly when she worked with her eye taped shut. The employee cannot use hand tools because of vibrations that hurt her jaw and head, and she cannot operate certain equipment such as fork lifts. She has had to wear goggles, put drops in her eyes several times a day, and must watch her jaw like "it's a soft spot on a baby's head." Although the employee attempts to be the same hard worker she was prior to the accident, her condition makes it very difficult for her.

The trial court found that the employee's injury arose out of her employment and awarded fifty percent permanent partial disability to the whole body. Twenty percent of the award was commuted to a lump sum. The Special Workers' Compensation Appeals Panel reversed, concluding that the evidence preponderated against the trial court's finding of a causal relationship between the car accident and the employee's current problems. The Panel opined that there "appears to be no objective evidence to support the contention that the [employee] suffered any trauma to her jaw in the November 1995 work-related accident." Thereafter, we granted the employee's motion for full Court review to consider whether the evidence preponderates against the trial court's finding that her injury arose out of her employment.

**Standard of Review**

The standard of review in a case such as this is *de novo* upon the record of the trial court, accompanied by a presumption of the correctness of the findings, unless the preponderance of the evidence is otherwise. Tenn. Code Ann. §50-6-225(e)(2). When issues regarding credibility of witnesses and the weight to be given their testimony are before a reviewing court, considerable deference must be accorded the trial court's factual findings. Krick v. City of Lawrenceburg, 945 S.W.2d 709, 712 (Tenn. 1997). However, this Court may draw its own conclusions about the weight and credibility of expert testimony when the medical proof is presented by deposition, as it was here, since we are in the same position as the trial judge to evaluate such testimony. Krick, 945 S.W.2d at 712; Orman v. Williams Sonoma, Inc., 803 S.W.2d 672, 676-77 (Tenn. 1994).

## Compensability

In order to be eligible for workers' compensation benefits, an employee must suffer an "injury by accident arising out of and in the course of employment." Tenn. Code. Ann. § 50-6-102(12). The phrase "arising out of" refers to the cause or origin of the injury. Hill v. Eagle Bend Mfg., Inc., 942 S.W.2d 483, 487 (Tenn. 1997). An injury arises out of employment "when there is apparent to the rational mind, upon a consideration of all the circumstances, a causal connection" between the work and the injury for which benefits are sought. Houser v. Bi-Lo, Inc., 36 S.W.3d 68, 71 (Tenn. 2001). In most cases, causation must be established by expert medical evidence, which may consist of medical testimony to the effect that a given incident "could be" the cause of the employee's injury when there is also lay testimony from which it reasonably may be inferred that the accident caused the injury. Resser v. Yellow Freight Sys., Inc., 938 S.W.2d 690, 692 (Tenn. 1997). However, an employee may not base his or her claim on speculative or conjectural proof. Hill, 942 S.W.2d at 487.

With these principles in mind, we review the record in the present case to determine whether the employee's injury arose out of her employment. The specific question before us is whether her symptoms were merely the old symptoms from the pre-existing TMJ condition or whether the car accident and resulting surgeries aggravated the pre-existing TMJ condition.

The record reflects that the employee was being treated for a painful problem with her nonwork-related TMJ condition, which resulted in Dr. Urbanek performing surgery in May 1995. At the time of the car accident in November 1995, the employee was doing "reasonably well" according to Dr. Urbanek, her prognosis was good, and Dr. Urbanek expected that she would be able to return to work without significant pain. According to the employee, she "was doing fine" in the months following the surgery.

When the employee was hit by the car on November 8, 1995, she was knocked to the ground and was seen lying on the pavement with her head against a curb. The employee testified that "her head hurt instantly." She mentioned the pain in her head "several times" in the emergency room, and at one point asked a nurse, "what about my head?" Maynard, the co-worker who was with the employee in the emergency room, corroborated the employee's testimony that she asked the nurse about the pain in her head. Maynard further testified that when she asked the employee how her knee was doing, the employee responded, "my knee is fine, my head is killing me." On the day after the accident, the employee's head "felt like a pumpkin. It just throbbed, and it felt so big." The employee testified, "my whole head was just killing me." She described the pain to a nurse at the employer's plant and obtained permission to see Dr. Urbanek. She explained to Dr. Urbanek that she had been hit by a car and was having severe headaches and jaw soreness. Despite negative diagnostic test results, Dr. Urbanek maintained both at the time he treated the employee and at the time he testified that the employee had fractured her jaw in the accident. He testified that her symptoms "were consistent with damage of some kind consistent with a fracture," and that after the accident she had symptoms that "were consistent with additional injury" to her jaw. He had to wire her jaw shut and later perform surgery that caused nerve damage that left the employee unable to close her right eye, lift

her eyebrow, or blink. Her face looked like she had a stroke and she had to keep her right eye taped shut.

Dr. McKenna, who performed two additional surgeries, testified that there was an injury to the jaw joint from the car accident and that the surgery performed by Dr. Urbanek that damaged the facial nerves was required as a result of that accident. Like Dr. Urbanek, his impression was that the employee had fractured her lower jaw. In Dr. McKenna's opinion, the presence of a fracture "would speak some to the magnitude of the trauma . . . but it's still possible to injure the joint without a fracture." He agreed that the employee had not fully recovered from the first TMJ surgery at the time of the accident, but that "it looked like she was doing pretty well."

Based on this lay and medical testimony, we conclude that the evidence preponderates in favor of the trial court's finding that the car accident aggravated the employee's pre-existing condition. Although aggravation of a pre-existing condition is not compensable if it results only in increased pain, there is evidence in this record, most of which is unrefuted, that there was an anatomical change or actual progression of the employee's underlying condition. See Sweat v. Superior Industries, Inc., 966 S.W.2d 31, 32-33 (Tenn. 1998). Unlike many workers' compensation cases in which there are competing medical witnesses, there is no medical opinion refuting causation in this case. To the contrary, the testimony of the doctors supports a finding of trauma as a result of the accident that necessitated treatment by Dr. Urbanek which, in turn, led to damage to the employee's facial nerves. See McClaster v. Methodist Hospital of Memphis, 550 S.W.2d 240 (Tenn. 1977) (holding that an injury resulting directly from surgical treatment of a compensable injury is itself compensable). To hold otherwise would require us to reject the uncontraverted testimony of the employee that her previous condition had worsened since the accident. In addition, we would have to reject the corroborating testimony of her co-workers that her head was found against the curb (allowing the inference that she hit her head when she fell to the ground) and that she complained of head pain in the emergency room, regardless of whether records of the paramedics or emergency room reflect such complaints. And finally, we would have to reject the medical proof that there was an anatomical change or progression of the employee's underlying condition. Rather than rejecting all of this proof, we conclude as the trial court did that the employee's injury arose out of her employment.

### Conclusion

In view of the foregoing discussion, we hold that the evidence does not preponderate against the trial court's finding of causation. Accordingly, the trial court is affirmed. Costs of this appeal are taxed to the employer.

_____
FRANK F. DROWOTA, III, JUSTICE

-6-