**Peggy EADS**

v.

**GUIDEONE MUTUAL INSURANCE COMPANY, et al.**

Supreme Court of Tennessee,
at Knoxville.

May 4, 2006 Session.

July 7, 2006.

C.J. Barnett and Paul C. Peel, Memphis, Tennessee, for the Appellant, GuideOne Mutual Insurance Company.

George R. Garrison, Sevierville, Tennessee, for the Appellee, Peggy Eads.

Paul G. Summers, Attorney General and Reporter, and Juan G. Villaseñor, Assistant Attorney General, for the Appellee, Tennessee Department of Labor and Workforce Development, Workers' Compensation Division, Second Injury Fund.

## OPINION

E. RILEY ANDERSON, J., delivered the opinion of the court, in which WILLIAM M. BARKER, C.J., and ADOLPHO A. BIRCH, JR., JANICE M. HOLDER, and CORNELIA A. CLARK, JJ., joined.

We granted review in this workers' compensation case to determine whether the trial court erred in awarding permanent total disability following an injury to the employee's leg where the employee had a pre-existing diabetes-related disability to the same leg. Having considered the record and applicable authority, we affirm the decision of the trial court awarding permanent total disability.

### Background

The facts as developed at trial are as follows. Plaintiff Peggy Eads ("Eads") was fifty-one years old at the time of trial. She went to work for the Smoky Mountain Children's Home in Sevierville, Tennessee in 1993. Defendant GuideOne Mutual Insurance Company ("GuideOne") was the workers' compensation carrier for the children's home at the time of the injury at issue in this case.

In August of 2003, Eads was working as an assistant cook at the children's home. Her duties included preparing food for the salad bar, making desserts, and assisting with the evening meal. On August 2, 2003, Eads was carrying a tray of food in the course and scope of her employment and tripped, falling to the floor. She sustained a comminuted fracture to her right femur and injured her right knee.

On August 5, 2003, Eads underwent surgery to repair her right femur. Because the fall had shattered her femur, the surgeon implanted a plate and screws to sta-

bilize her leg. Eads was discharged on August 12, 2003, but was re-admitted on August 23 with pain and swelling. She was discharged a second time on August 29, 2003, and by October 2003 the fracture had healed.

During the 1990s, Eads had been diagnosed with diabetes. She stated that she attempted for many years to control the diabetes without medical assistance. However, in August 2001, she sought treatment for her diabetes. She began taking medicine and, among other things, was prescribed an ankle-foot orthosis ("AFO") to stabilize a Charcot joint resulting from the diabetes in her right ankle. The AFO extended from below the right knee to the tip of Eads' toes and was designed to immobilize her ankle while allowing her to walk about. Eads was wearing the AFO at the time of her fall and stated that, because it was rigid, it prevented her from catching herself when she fell.

Eads testified that since the fall she experiences back pain, as well as pain in her hip, buttocks, and thigh, whenever she sits for longer than an hour. She must use a walker and requires a wheelchair if she must walk longer than ten or fifteen minutes. She testified that she walks with a limp because her right leg is now shorter than her left leg. She also testified that she is unable to drive because of the loss of sensation in her right leg.

Eads had worked at the children's home for approximately ten years at the time of her accident. Prior to that, she said that she had worked in housekeeping at a variety of motels, had worked as a dental assistant, and, over twenty years earlier, had worked in medical billing. Eads had completed the ninth grade and received a G.E.D. in the 1970s. She has not worked since the accident. She also testified that she is now legally blind as a result of her diabetes.

Dr. Steven Smith, an orthopedic surgeon, testified by deposition. Dr. Smith first saw Eads on January 30, 2003, for treatment of her Charcot joint. Dr. Smith explained that a Charcot joint is a "bone and joint destruction and a deformity that is usually because of a neuropathic condition, which is most commonly diabetes." Dr. Smith said that he diagnosed Eads with a Charcot joint in her right ankle in January 2003. He prescribed a walking cast to immobilize Eads' ankle. The cast extended from just below Eads' knee to the tip of her toes. Eads wore the cast until May 2003, when Dr. Smith switched her to the AFO. Like the walking cast, the AFO was designed to keep her ankle immobile and was a molded brace fitted to Eads' leg from just below her knee to the tip of her toes.

Following Eads' fall, Dr. Smith performed surgery to repair the comminuted fracture to Eads' right femur. Dr. Smith explained that the femur was "broken in pieces" above Eads' right knee joint and required a plate and screws to stabilize the leg. Dr. Smith stated that Eads' right leg is now approximately one-quarter inch shorter than her left leg as a result of the surgery. She also has limited knee motion. Based on the fracture alone, Dr. Smith assigned a 10% impairment to the lower extremity. However Dr. Smith said that based on the nature of the fracture and the effects of it, including the loss of flexion in Eads' knee, he assigned a 33% impairment to the lower extremity as a result of the fall, or 13% to the body as a whole, using the AMA Guides.

Dr. Vincent Tolley, Eads' family physician, also testified by deposition. Dr. Tolley testified that he began treating Eads in August 2001. At the time Dr. Tolley began treating Eads, she had uncontrolled diabetes and told him that she had had diabetes for ten years. Dr. Tolley stated

that in August 2001 Eads, who is five-foot-one, weighed 138 pounds. By October 2001, Eads weighed 158 pounds. In December of 2002 she weighed 190 pounds. Dr. Tolley referred Eads to Dr. Law, an endocrinologist, for help controlling her diabetes.

Dr. William M. Law, Jr. testified by deposition that he specializes in endocrinology and metabolism. He first saw Eads on September 16, 2003, for treatment of her diabetes. He said that she was referred to him because poor control of her diabetes was impeding her recovery from the surgery on her femur. He testified that her diabetes affected the healing of her fracture. He also testified that the fracture affected her diabetes, because trauma tends to increase the body's resistance to insulin. He said that the effect would only be temporary, however.

Finally, Dr. William E. Kennedy, an orthopedic surgeon, testified by deposition that he performed an Independent Medical Examination on Eads on May 3, 2004. Dr. Kennedy stated that Eads had mechanical low back syndrome, or painful recurrent strain to her lower back, as a result of the fracture she sustained in the fall. He also noted that she had diabetic arthropathy of the right midfoot due to her diabetes "which, of course, was clearly present and was clearly advanced and under treatment" at the time of Eads' fall. Dr. Kennedy opined that Eads had sustained a 40% permanent partial disability to the body as a whole as a result of her fall. He apportioned the disability to the body as a whole rather than just to the leg based on gait derangement and back pain. Dr. Kennedy also assigned a 15% permanent partial impairment to the right lower extremity as a result of the pre-existing Charcot joint. However, he testified that the 40% impairment rating was solely as a result of the fall, stating that Eads "would not be classified for permanent physical impairment at a lesser level than the forty percent, even if she did not have the diabetes or if she did not have the obesity." At the time Dr. Kennedy examined her, Eads weighed 225 pounds.

The trial court found that Eads was permanently and totally disabled considering her age, education, vocational history, and local job opportunities as a result of the fall and the fractured femur. The trial court rejected GuideOne's argument that GuideOne should only be responsible for a portion of Eads' disability due to her pre-existing Charcot joint and dismissed the case against the Second Injury Fund. The court also held that Eads' pre-existing diabetes was not caused or aggravated by the injury and is not compensable.

GuideOne appealed. We accepted review before the case was heard or considered by the Special Workers' Compensation Appeals Panel.

### Analysis

Appellant GuideOne argues that the record does not support the trial court's determination that Eads is permanently and totally disabled as a result of her August 2003 fall. GuideOne argues that Eads sustained an injury to a scheduled member, rather than an injury to the body as a whole, and argues that there is not sufficient evidence in the record from which to conclude that Eads' injury is permanent. GuideOne further argues that if Eads is permanently and totally disabled, its liability should be limited to 50%, with the remainder borne by the Second Injury Fund. We will consider each argument in turn.

### Permanent Total Disability

■■■ "The existence and extent of a permanent vocational disability are questions of fact for determination by the trial court and are reviewed de novo, accompa-

nied by a presumption of correctness, unless the preponderance of the evidence is otherwise." *Whirlpool Corp. v. Nakhoneinh,* 69 S.W.3d 164, 170 (Tenn.2002) (citing *Walker v. Saturn Corp.,* 986 S.W.2d 204, 207 (Tenn.1998)). Although permanence must be established by expert medical evidence "in all but the most obvious cases," *Corcoran v. Foster Auto GMC Inc.,* 746 S.W.2d 452, 458 (Tenn.1988), this "does not mean that the deposition testimony of experts should be read and evaluated in a vacuum.... [S]uch testimony must be considered in conjunction with the lay testimony of the employee as to how the injury occurred and the employee's subsequent condition." *Thomas v. Aetna Life & Cas. Co.,* 812 S.W.2d 278, 283 (Tenn.1991) (citations omitted).

■ Having carefully reviewed the record, the evidence does not preponderate against the trial court's conclusion that Eads is permanently and totally disabled as a result of her August 2003 fall. Dr. Kennedy assigned a 40% impairment to Eads' body as a whole based on the injury to her leg as well as the resulting gait derangement and back pain. Although Dr. Smith assigned only a 33% impairment to the lower extremity, he did not evaluate or consider the gait derangement and back pain caused by the injury. Where an injury to the leg results in unscheduled injuries such as back pain and gait derangement, it is proper to classify the injury as an injury to the body as a whole. *See Long v. Mid–Tennessee Ford Truck Sales, Inc.,* 160 S.W.3d 504, 511 (Tenn.2005).

As to permanence, the record also supports the trial court's conclusion that Eads' body-as-a-whole injury is permanent. Although neither Dr. Kennedy nor Dr. Smith explicitly stated that Eads' injury is permanent, the testimony of both physicians support the finding of permanence. Even though he did not explicitly testify that Eads' back syndrome is permanent, Dr.

Kennedy assigned a permanent disability rating. Dr. Smith testified that Eads' right leg is one-quarter inch shorter than her left leg as a result of the surgery, with no indication the discrepancy will change. That discrepancy causes Eads' gait to be uneven, leading to her back problems. When considered "in conjunction with the lay testimony of the employee" that she cannot walk more than ten or fifteen minutes even when using a walker and that she has constant back pain as well as pain from sitting, *Thomas,* 812 S.W.2d at 283, the evidence does not preponderate against the finding of permanence.

Finally, as to whether Eads is totally disabled, the evidence likewise does not preponderate against the trial court's conclusion. We have often observed that the question of *vocational* disability is a question of fact and that the employee's own assessment of her condition and work prospects is competent evidence. *See Orrick v. Bestway Trucking, Inc.,* 184 S.W.3d 211 (Tenn.2006). Here, Eads testified that she had received a G.E.D. in the 1970s but had received no additional education or training since then. She had worked in food-service, in housekeeping, and as a dental assistant. All of those positions require workers to be on their feet and ambulatory, which now precludes Eads from performing those jobs. Eads also testified that she had worked in medical billing but that she had not done so for over twenty years; she said that at the time she was working, everything was done by hand. Given Eads' skills, education, and injury, the evidence does not preponderate against the trial court's finding that she is totally vocationally disabled.

*Second Injury Fund*

■ GuideOne makes the somewhat novel argument that, even if Eads is permanently and totally disabled, GuideOne

should nevertheless not be liable for more than 50% of Eads' workers' compensation benefits because the injury results from injury to a previously-injured leg, a scheduled member with a maximum compensation rate of 50%. Relying on *Watt v. Lumbermens Mutual Casualty Insurance Co.*, 62 S.W.3d 123 (Tenn.2001), GuideOne urges this Court to adopt a bright-line rule that where an employee with a pre-existing disability to the leg becomes totally disabled due to a second injury to the leg, the employer's share should be capped at 50%, with the Second Injury Fund paying the balance. For the following reasons, we reject GuideOne's argument.

In *Watt*, the employee was totally disabled due to a combination of scheduled-member injuries. Although the first injury resulted in disability to the hand, and the second injury resulted in 100% disability to the leg, the percentage of disability to the body as a whole from the two injuries was less than 100% when added together. In applying Tennessee Code Annotated section 50–6–208(a), we stated that an employee's second or latest injury must be considered alone, "without consideration of the prior injury." *Id.* We further clarified that when an employee is totally disabled due to a combination of scheduled-member injuries, the court must convert the second, or subsequent scheduled member disability to a disability to the body as a whole in order to determine the employer's share. *Id.* at 132. Because the second injury was a 100% disability to the leg, we held that the injury converted to 50% to the body as a whole, that the employer's share was calculated at 50%, and that the Second Injury Fund's share was the remaining 50%. *See id.; see also* Tenn.Code Ann. § 50–6–207(3)(A)(ii)(*o*).

Here, GuideOne argues that because Eads had a pre-existing Charcot joint, which the employer was aware of and to which Dr. Kennedy assigned a 15% permanent impairment rating, its liability for Eads' permanent total disability should be capped at 50%. GuideOne's argument misreads *Watt* for two reasons.

First, in this case the trial court found that Eads' permanent total disability was *solely* attributable to the injury she sustained on August 2, 2003, in the course and scope of her employment. Dr. Kennedy testified that even though Eads had a pre-existing 15% impairment to her leg due to her diabetes, she nevertheless sustained a 40% permanent impairment due solely to the fall. Because the evidence does not preponderate against the trial court's conclusion that Eads' permanent total disability is solely attributable to her fall, there is no basis upon which to apportion any amount of the award to the Second Injury Fund. *See* Tenn.Code Ann. § 50–6–208.

Second, GuideOne's argument assumes that two or more injuries to the leg could result in permanent total disability, which is contrary to the plain language of the scheduled-member statute. *See* Tenn. Code Ann. § 50–6–207(3)(A)(ii)(*o*). Disability to the body as a whole can only be awarded when the employee sustains a total disability due to some combination of injuries beyond a single scheduled member, incapacitating the body as a whole. *See, e.g., Long,* 160 S.W.3d at 511; *Thompson v. Leon Russell Enters.,* 834 S.W.2d 927, 929 (Tenn.1992). Early cases holding differently, such as *Johnson v. Anderson,* 188 Tenn. 194, 217 S.W.2d 939, 940–41 (1949), are not compatible with the clear legislative intent expressed in the schedule-member statute to limit awards affecting *only* scheduled members to the statutory caps. In this case however, as we have explained, the trial court properly apportioned the injury to the body as a whole in light of the evidence that Eads experienced disability beyond the disability to her leg alone.

*Conclusion*

Having reviewed the record and applicable authority, we affirm the trial court for the reasons stated herein. We hold that Eads is permanently and totally disabled solely as a result of her fall on August 2, 2003, and therefore allot the entire award to GuideOne. Costs shall be taxed to appellant GuideOne and its sureties, for which execution shall issue if necessary.