# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
May 18, 2010 Session

## BERKELEY PARK HOMEOWNERS ASSOCIATION, INC., ET AL. v. JOHN TABOR, ET AL.

### Appeal from the Chancery Court for Knox County
No. 165056-1     John F. Weaver, Chancellor

---

### No. E2009-01497-COA-R3-CV - FILED JULY 20, 2010

---

Berkeley Park Homeowners Association, Inc., and Southern Traditions Partners, LLC (collectively referred to as "Berkeley Park") filed a motion for contempt against John Tabor and Tabor Construction, Inc. (collectively called "Tabor"),[1] seeking to enforce a 2006 mediated settlement agreement governing the construction of a house being built by Tabor in Southern Traditions' development known as Berkeley Park Subdivision. Berkeley Park alleged that Tabor was in violation of numerous provisions of the mediated agreement, while Tabor contended that the parties had reached another agreement in 2007 that superseded the earlier agreement. Following a bench trial, the court held that there was no superseding agreement and that the evidence clearly and convincingly showed Tabor had violated the provisions of the mediated agreement. The court entered judgment in favor of Berkeley Park, awarding it damages of $34,042.11, including attorney's fees. Tabor appeals. We affirm.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed; Case Remanded

CHARLES D. SUSANO, JR., J, delivered the opinion of the Court, in which HERSCHEL P. FRANKS, P.J., and JOHN W. MCCLARTY, J., joined.

Mark E. Brown, Knoxville, Tennessee, for the appellant, John Tabor and Tabor Construction, Inc.

Julie Cochran Fuller, Knoxville, Tennessee, for the appellees, Berkeley Park Homeowners Association, Inc., and Southern Traditions Partners, LLC.

---

[1]American Trust Bank of East Tennessee was also named as a defendant, but it did not appear in the trial court and is not a party to this appeal.

## OPINION

### I.

In October 2004, Tabor purchased Lot 59 in the Berkeley Park Subdivision in West Knoxville from Southern Traditions subject to the covenants and restrictions regulating the subdivision. Litigation among the parties began the following year when Berkeley Park sought injunctive relief and damages against Tabor, alleging, among other violations, that Tabor failed to submit proposed construction plans to the subdivision's architectural control committee ("the ACC") for approval.

Initially, the trial court issued a temporary injunction pending Tabor's submission, and Berkeley Park's approval, of the construction plans. On March 8, 2006, after the parties failed to agree on the plans, they entered into court-ordered mediation. They subsequently reached a mediated settlement, pursuant to which Tabor agreed to submit plans for the construction of a "country cottage"style home selected during the mediation from the "William Poole Classical House Plans" series and to submit to the ACC for approval the proposed construction materials for the house. While the house plans, as submitted and attached to the mediated agreement, were "approved," the agreement expressly provided that "both parties agree that any modifications made to these plans . . . must be reviewed and approved by the ACC, including, but not limited to, the addition of square footage. . . ." The agreement also required Tabor to post a construction bond, pay all current and past-due homeowners' fees on all the subdivision lots owned by it,[2] hire a licensed architect to consult with regarding the house's construction and provide monthly progress reports to the ACC, and use a landscape plan generated by a landscape architect to be appointed by Berkeley Park. The mediated agreement was expressly incorporated into the court's order entered May 5, 2006 ("the Agreed Order"). The Agreed Order resolved the entire case to that point. The temporary injunction was lifted to permit Tabor to continue construction on Lot 59.

On January 17, 2007, Berkeley Park filed a "motion for contempt," the one now before us on this appeal. Berkeley Park sought injunctive relief and an order requiring Tabor to show cause why it should not be held in contempt of the Agreed Order. The motion alleged violations of the Agreed Order, including that Tabor had recommenced construction on Lot 59 without having the square footage and other modifications to the plans or the proposed construction materials approved by the ACC and without the use of a consulting architect as required. In response, Tabor claimed that the "true intent" behind the contempt

---

[2]The record indicates that Tabor purchased at least two other lots in the Berkeley Park Subdivision.

motion and the previous actions by Berkeley Park was to prevent Tabor, as a competing home builder, from constructing homes in the subdivision.

The court held a bench trial on the contempt petition over five days beginning in March 2007 and concluding in November 2008. In January 2008, Berkeley Park modified its contempt petition to allege that Tabor was continuing to make "un-approved revisions" to the plans in violation of the Agreed Order. In its amended response, Tabor claimed that the parties had "reached an agreement" on April 4, 2007, that had resolved all existing issues with respect to the construction of the house and that Tabor had constructed the house pursuant to this new agreement.

At trial, the proof centered on Berkeley Park's charges that Tabor was in violation of the Agreed Order and, following April 4, 2007, Tabor's claim that the "new" agreement of that date governed the construction. In particular, the court heard testimony regarding the allegations that Tabor (1) had not hired a licensed architect, (2) had not had construction materials approved by the ACC, and (3) had not had square footage or numerous other modifications to the submitted construction plans approved by the ACC. Further, Berkeley Park asserted that Tabor's homeowner's dues remained unpaid and that he had not used an approved landscaping plan.

The entity Southern Traditions included partners Robert Markli and Kent Sanderson. Together, the two comprised the ACC. Markli testified that a plan Tabor had submitted from the William Poole book of home designs had been approved the previous year during mediation. He noted Tabor had submitted deviations to the plans noting "redline markings" indicating that Tabor had planned to make significant changes. However, because the ACC could not discern "what it was going to look like, what he was planning to do," the modified plans were rejected and Tabor was asked for more specific details. Markli said Tabor twice submitted modified plans that were not accepted by the ACC because of lack of detail regarding the revisions. According to Markli, had Tabor built the house as set out in the original plans without the revisions, the plans "absolutely" were accepted. However, he asserted that there were "massive, significant differences" in what Tabor had constructed versus what was in the originally-approved plans. Markli said that, although some "tweaking" of the plans was acceptable given that the foundation had already been laid when the plans were chosen, Tabor, for no apparent reason, had made major variations that were unacceptable to the ACC.

Markli said Tabor had submitted "some" proposed materials that were accepted with the exception of a standard, modular brick that Tabor had planned to substitute for the siding depicted in the approved plans. Markli testified that he was unable to determine from Tabor's submissions what the total square footage of the home, as modified, would be.

-3-

Markli acknowledged receipt of a letter in February 2007 advising that Tabor had hired an architect, however, he did not believe the architect was licensed and he had had no contact with or reports from her. Markli explained that the whole purpose of requiring Tabor to use a consulting architect was to have a third party monitor and verify to the ACC that the house was being built in accordance with the approved plans. Markli requested that the court ensure that the house be constructed in compliance with the approved plans "in every reasonable way" and he wanted construction halted pending approval by the ACC of a set of finished plans.

At the time of the hearing on April 4, 2007, the Lot 59 house had been framed and drywall had been installed, but no exterior materials had been installed. During the hearing on that date, the court requested that the parties generate, with precision, a list of the existing issues with the house's construction – with Berkeley Park to list the claimed "problems and deficiencies" and Tabor to indicate "what it is he's resisting." In response to the court's request, the parties met and counsel for Berkeley Park generated a handwritten list of some eleven "modifications which have not been approved" that were unacceptable to Berkeley Park; the list included such items as "deepen front porch per plans," resize garage windows per plans, submit siding detail sample, submit window details for approval, "re-footer" back corner of the house to align with the right corner and other specific construction details. This list, with a few notations added by Tabor's counsel, Mr. Norris, was submitted to the court. In addition, Tabor submitted an accompanying set of the original house plans with markings indicating Tabor's intended modifications. Tabor advised that the plans showed "all [the revisions] at this point . . . ."

The parties agree that, during a recess of the April 4, 2007 hearing, the parties met in the hallway. Using the list addressing unapproved modification that they had earlier prepared for the court, the parties had a discussion focused on how Tabor could resolve the identified construction issues and complete the house in a manner acceptable to Berkeley Park. No writing evidencing any agreement between the parties was produced that day. However, several weeks later, on May 18, 2007, Tabor's counsel drafted an agreement based on his understanding of the parties' earlier discussions. He styled it as the "Parties' Agreement Regarding House to be Built on Lot 59 in Berkeley Park" ("the Proposed Agreement"). Tabor testified that he signed the Proposed Agreement as drafted by his counsel and that he was aware it was then sent to the ACC for review. Upon receipt, Markli, on behalf of Berkeley Park and the ACC, reviewed it and found "numerous articles that weren't exactly as [he] understood the agreement." On May 24, 2007, Markli made revisions and notes to clarify his understanding of "what [Berkeley Park] expected to be done [with the house]" and faxed it back to Tabor's counsel. The cover sheet included a note from Markli to Mr. Norris that stated:

We note that Mr. Tabor has recommenced construction of lot 59 Berkeley Park even though he has not yet gotten plans approved. We note that he has made some of the agreed changes, thought the most important one, aligning the cornice on the garage and porch has been attempted but not achieved. I have noted some of the deficiencies on the submitted plan received in my office on May 18 . . . and reviewed today. I note that brick masons are on the job and no arch bucks for the garage doors have been installed and I called Mr. Tabor to notify him. He said he would handle it. Please have him call me if he has any questions. We'd hate to see him have to tear out any more work, but will not hesitate if he attempts to flaunt the agreement and build substandard, unapproved product.

Markli also faxed to Tabor directly Markli's written responses and comments with respect to the proposed modifications Tabor had made on the original set of approved plans. In July, Markli notified his counsel that (1) Tabor had gone ahead with construction, (2) Tabor was not in compliance with the "agreement" discussed in April and (3) outlined other problems. Markli stated that he also personally spoke to Tabor and noted some continuing problems with the construction such as the lack of an installed water table. In response, Ms. Chadwell, counsel for Berkeley Park, wrote to Mr. Norris as follows:

Please find attached the Order ["draft agreement"] from the last [April 4, 2007] hearing signed by my client. Also attached are updated plan specifications. Please also be advised that there are three issues remaining with lot 59 construction: I have been informed by Mr. Markli that there is no watertable as discussed, the arch over the garage is not as agreed, and Hardy shake was to be used instead of Hardy siding. Once these are corrected, this matter should be resolved."

At a hearing on February 28, 2008, Tabor noted that he had essentially completed construction of the house on Lot 59. The court stated that, regardless, the issue before it was still whether Tabor complied with the Agreed Order. Tabor indicated that the matter may not be that simple if the parties had since agreed between themselves to "slightly different terms. . . ." On questioning by the court regarding the April 4, 2007, discussions between the parties, Berkeley Park denied that an agreement was ever reached, only that they "came to terms." As counsel put it, "We took a shot at it, and we never got there. So, yes, we are here today because there's a violation of the mediated agreement back from '06."

-5-

The parties appeared for a final time on November 25, 2008, and the court heard further proof regarding the alleged violations of the Agreed Order and, as described by the trial court, "the whole crux of the case," *i.e.*, Tabor's position that he constructed the home under a new agreement reached in April 2007. The following day, the trial court announced its ruling from the bench which was in favor of Berkeley Park as to 15 issues presented in the parties' joint "statement of issues" for disposition. At the outset, the court explained the nature of the case:

> This is more of an action for breach of a settlement agreement or mediation agreement or an action to carry an agreed order into effect, but with [Berkeley Park] also having reserved their rights under the underlying Covenants and Restrictions.

In view of its characterization of the case as something other than a contempt case, the court further noted that "where an issue calls for a finding of contempt, the Court is finding a violation of the [Agreed Order] of May 5, 2006, but need not address whether the violation constitutes contempt."

In summary, the court found that (1) Tabor had violated multiple provisions of the Agreed Order; (2) there was no agreement in April 2007 that superseded the March 2006 mediated agreement; (3) Berkeley Park had not acted unreasonably in its dealings with Tabor; and (4) Berkeley Park had the right to abate and remedy the deficiencies in the house at issue, all at Tabor's cost, pursuant to the applicable provision of the covenants and restrictions. The court awarded Berkeley Park $17,584.47 – the homeowners' association dues owed by Tabor – and $16,523.98 in attorney's fees and costs, for a total award of $34,108.45. Tabor filed a timely notice of appeal.

II.

Tabor presents the following issues for our consideration:

> 1. The trial court erred in concluding that there was no agreement between the parties on April 4, 2007 that superseded the prior mediated settlement agreement of March 5, 2006.
>
> 2. The trial court erred in concluding by clear and convincing evidence that Tabor was in contempt of multiple provisions contained in the Agreed Order incorporating the mediated settlement agreement regarding its construction of the Lot 59 home.

-6-

3. The trial court erred in concluding by clear and convincing evidence that Berkeley Park did not act unreasonably in their dealings with Tabor concerning the construction of the Lot 59 home.

4. The trial court erred in concluding that Berkeley Park is entitled to exercise their remedies under the governing covenants and restrictions and to an award of their costs and attorney's fees.

III.

At the outset, we note that the trial court went beyond the "preponderance of the evidence" standard and found "clear and convincing" evidence to support many of its findings. In this non-jury case, our standard of review is de novo upon the record of the proceedings below; however, the record comes to us with a presumption of correctness as to the trial court's factual determinations, a presumption we must honor unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *Wright v. City of Knoxville*, 898 S.W.2d 177, 181 (Tenn. 1995). Our review of questions of law is de novo with no presumption of correctness attaching to the trial court's conclusions of law. *Campbell v. Florida Steel Corp.*, 919 S.W.2d 26, 35 (Tenn. 1996).

IV.

A.

Among the issues presented by the parties for the trial court's disposition was "Issue 11": "Does the [Proposed Agreement] made by the parties on April 4, 2007, and reduced to writing and signed by [Berkeley Park] on May 24, 2007, supersede the prior agreement between the parties of March 5, 2006?" In its bench ruling, the trial court answered that question in the negative:

> The first question really with respect to Issue Number 11 concerns whether there was an agreement reached on April 4, 2007. The Court finds and concludes that the evidence does not establish any such agreement.

The gist of Tabor's position is that "taken in full context the words and actions of the parties demonstrate that there was an agreement reached on April 4, 2007." Tabor concludes

that it acted reasonably in constructing the house based on that agreement and therefore, the trial court erroneously found him in violation of the mediated agreement.

We begin mindful that the mediated agreement is part of a valid court order, *i.e.*, the Agreed Order entered in May 2006, that governed the construction of the Lot 59 house and related issues. As the trial court observed, "that's the benchmark – compliance with the order [or] no[] compliance with the order." There is no dispute that the parties met outside of court on April 4 and, using the list of problematic modifications that Tabor had undertaken, discussed how those modifications could be corrected or resolved. It is also undisputed that no written agreement was generated on April 4. Questioned by the court whether a written agreement existed on April 4, Tabor's counsel, Mr. Norris responded, "Well – no, none of it did. It was in our heads that day I'm afraid." Moreover, the evidence reflects that the only draft agreement containing both parties' signatures is one returned with revisions by Berkeley Park. At trial, Markli testified regarding his understanding of the Proposed Agreement as follows:

> Q: Mr. Markli, will you identify that document for me; what is that document?
>
> A: This looks like the agreement that we reached in the hall outside the courtroom in April of last year.
>
> Q: Okay. Do you remember when we received a copy of that [P]roposed [A]greement?
>
>                     \*   \*   \*
>
> Q: Okay. If I represent to you it was May 18th of '07, would you - -
>
> A: That's correct, yes.
>
> Q: Now as a result of you receiving that document, what, if anything, did you do?
>
> A: I review[ed] it; looked at it; found numerous articles that weren't exactly as I understood the agreement. So . . . on the 24th of May, I faxed back to you a revised copy of this with notes on it describing what our understanding of the agreement was.

Q: Okay. Now, you - - you were here the last hearing, and I believe Mr. Tabor's attorney had represented to the Court we did not respond back to him until July of '07.

A: Yes, I remember that.

Q: Okay. What if you know, were the reasons for that?

A: I can't understand that because I faxed you back a copy of it immediately, and then I faxed to Mr. Norris, individually, a copy of the drawing that they had sent accompanying that discussion . . . – which we have here with my notes on it stating what we expected to be done.

Q: Okay.

A: And that was on May the 24th.

Q: What, if anything, happened on July 16th of '07 regarding this [Proposed Agreement]?

A: Well, July 16th of '07, I sent you a note. I had spoken to Mr. Tabor. He had gone ahead with construction, and I had noted a number of things that they were doing that was not in compliance with that [Proposed Agreement], and I had contacted Mr. Tabor by telephone specifically to inform him that there were some issues, and I drafted you a letter at that time also outlining what those issues were.

At a later point in his testimony, Markli reiterated that upon reviewing the Proposed Agreement prepared by Mr. Norris, he "added [his own] notes to clarify bringing it into compliance to what we agreed to." On the trial court's questioning of counsel for Berkeley Park regarding the status of an April 4, 2007, agreement, the following exchange took place:

The Court: You don't concede there was an agreement.

Ms. Chadwell: What our position is, is that the parties discussed the terms outside the courtroom. When we left here, we believed there was an agreement, the terms never announced to the court.

-9-

* * *

> The [Proposed Agreement] when it was sent over to me and then looked at by Mr. Markli, we did not have a meeting of the minds. There was no - - apparently no meeting of minds between the parties as to what was actually agreed that Mr. Tabor was going to do.
>
> So, no, we do not have an agreed order in this case from April of '07. We had an attempt at it. We took a shot at it, and we never got there.

The record further reflects that in July 2007, Markli notified his counsel of additional issues with the ongoing construction on Lot 59. At trial, Markli explained: "So on July 16th I called [Ms. Chadwell] up and said: Hey they're out here doing this stuff; we still don't have an agreement; and not only that, but here's three more things . . . they're not putting the brick arches on there; they . . . haven't put [the] water table on. So in addition to the agreement we're trying to work out these 13 items, we have these three issues that need to be resolved."

Perhaps most significantly, the record contains a September 13, 2007, letter from Mr. Norris to Ms. Chadwell in which Mr. Norris wrote:

> I don't see that an Order has been entered pursuant to the last [April 4, 2007] court hearing. My file reflects that I drew up an agreement, had Mr. Tabor sign it and sent it to you. Some time later you faxed a copy of that same agreement with several changes in it back to me. I don't know that we had a meeting of the minds on the agreement, and I don't know that an Order was ever prepared.

"It is well settled that a binding contract must result from a meeting of the minds, be based upon sufficient consideration and be sufficiently definite to be enforced." *Roberts v. National Safety Associates, Inc*., No. 02A01-9506-CH-00134, 1996 WL 497395 at *4 (Tenn. Ct. App. W.S., filed Sept. 4, 1996) (citing *Peoples Bank v. ConAgra Poultry Co.*, 832 S.W.2d 550, 553 (Tenn. App. 1991)); *Roy McAmis Disposal Service, Inc. v. Hiwassee Sys., Inc.*, 613 S.W.2d 226, 229 (Tenn. Ct. App. 1979). "In addition, a modification of an existing contract cannot be accomplished by the unilateral actions of one of the parties. There must be the same mutuality of assent and meeting of the minds as required to make a contract. New negotiations cannot affect a completed contract unless they result in a new agreement."

*Id*. (citing ***Balderacchi v. Ruth***, 36 Tenn. App. 421, 256 S.W.2d 390, 392 (Tenn. Ct. App. 1952)).

While Tabor urges that the Proposed Agreement was at times referred to by both parties and counsel as an "agreement," and therefore should be so enforced, we reject this argument, as did the trial court. In our view, the document at best represents the parties' continuing negotiations in one area – modifications to the approved plans. In other words, the mediated settlement governing the construction expressly required Tabor to submit to the ACC for approval any modifications to the original plans approved during the mediation. The parties were in court again because Tabor was alleged to have violated this provision by making unapproved modifications to the plans. We see the April 4, 2007, discussions and the Proposed Agreement that followed as an effort by the parties to do that which was already required under the mediated agreement – address any modifications to the original plans so that the house could be completed as approved. On our review of the evidence, nothing suggests that the Proposed Agreement based on the April 4 discussions was ever intended to resolve any issue other than the existing, unapproved modifications to the plans. Certainly, nothing remotely suggests that the Proposed Agreement would replace the mediated agreement. In his testimony, Tabor admitted as much when he was forced to concede that the provisions of the mediated agreement and Agreed Order remained in force following the April 4 discussions. Tabor testified as follows:

> The Court: [D]id somebody say, Mr. Tabor, you no longer have to have any modifications to the plans approved? Did anybody say that?
>
> Tabor: The house was already built.
>
> The Court: Okay. Did anybody say that to you? You no longer have to have any modifications to the plans approved.
>
> Tabor: No. I wouldn't say that.
>
> *   *   *
>
> The Court: Okay. Did anybody say you no longer have to post a construction bond?
>
> Tabor: I got a bond posted.

-11-

The Court: Did anyone say you no longer had to have a construction bond?

Tabor: No.

The Court: Okay. Did anyone say you no longer have to submit the materials for the construction of the residence on lot 59?

Tabor: I submitted materials.

The Court: Did anybody say you no longer had to do that?

Tabor: I didn't take them back, so - - but no.

The Court: No. Okay. Did anyone say, Mr. Tabor, you no longer have to have a licensed architect?

\* \* \*

Tabor: Bob Markli - - well, Bob Markli agreed.

\* \* \*

The Court: Okay. So it wasn't outside?

Tabor: No.

\* \* \*

The Court: All right. So there is a record of that then.

\* \* \*

The Court: Did anyone as part of your agreement on April the 4th say, Mr. Tabor, neither you nor your company no longer have to ensure that the Homeowners Association dues are kept current on lot 59?

Tabor: No.

-12-

The Court: Did anyone on April 4 say we're no longer going to go by the settlement agreement or the order . . . we're no longer going to go by the [Agreed Order] entered May 5, 2006, or the agreement signed by all of us on March 8, 2006 with [the mediator]?

Mr. Tabor: Well, I mean, to me, it's a yes, because we came to an agreement I thought on April 4th.

The Court: Okay. Did anyone say that?

\* \* \*

Mr. Tabor: Jennifer.

The Court: Jennifer Chadwell said it.

Mr. Tabor: Yes.

The Court: Where did she say that?

Mr. Tabor: Well, she said we had a[n] agreement right out in the hallway - -

The Court: Okay.

Mr. Tabor:  - - before we came in.

The Court: Where did she say that we no longer have to go by the agreement of [the mediator]?

Mr. Tabor: Well, she didn't say that; you're right.

Where parties continue to negotiate regarding the material terms of a contract, there has been no mutual assent. *Peoples Bank v. ConAgra Poultry Co.*, 832 S.W.2d at 553. Moreover, "proof of an ambiguous course of dealing between the parties from which differing inferences might be drawn regarding additions to or modifications of what was a limited and incomplete agreement is not sufficient to establish the required mutual assent." *Lay v. Fairfield Dev.*, 929 S.W.2d 352, 353-56 (Tenn. Ct. App. 1996).

It is also well established that the "contemplated mutual assent and meeting of the minds cannot be accomplished by the unilateral action of one party, nor can it be accomplished by an ambiguous course of dealing between the two parties from which differing inferences regarding continuation or modification of the original contract might reasonably be drawn." *Jamestowne on Signal, Inc. v. First Fed. Sav. & Loan Ass'n*, 807 S.W.2d 559, 564 (Tenn. Ct. App. 1990). In the present case, unapproved modifications were the only subject addressed in the Proposed Agreement and there is no evidence to indicate that the parties finally came to terms on the modifications issues. Certainly, there is no evidence that the mediated agreement and Agreed Order were superseded.

In summary, the evidence does not preponderate against the trial court's finding that the parties never entered into an agreement that superseded the previously-entered mediated agreement. It appears, as Berkeley Park concedes, that the parties met on April 4, 2007, and may have even left the hearing believing they had an understanding regarding the unapproved modifications and the completion of the house in a manner acceptable to both parties. Once an attempt was made to reduce the discussions to writing, however, the lack of agreement became obvious.

B.

In a related argument, Tabor contends that by its actions on April 4, 2007, Berkeley Park is estopped to deny the existence of an April 4 Agreement and, as a result, waived its right to enforce the March 5, 2006, mediated agreement. In particular, Tabor contends that Berkeley Park failed to object "when [Tabor] resumed construction based on the April 4, 2007 agreement, until July 16, 2007, when the house was essentially completed." Further, Tabor asserts that Berkeley Park could have sought another injunction to halt the ongoing construction, but "[i]nstead . . . sat idly by while construction continued and then returned to Court only when the home was substantially completed."

In the present case, the trial court noted, but implicitly rejected, Tabor's claim that principles of estoppel or waiver were applicable, so as to prevent Berkeley Park from exercising its right to enforce the Agreed Order. The trial court stated:

> In closing argument [Tabor] argued that even if there was no meeting of the minds on April 7, 2007, [Tabor] nonetheless relied upon what they understood to be an agreement in completing the house. But at page 210 of the transcript of the hearing of February 25, 2008, [Tabor] testified that the house was already built on April 4, 2007. That is just one aspect of the matter which the Court finds to be noteworthy, but the Court

-14-

finds, though, that there was no agreement reached on April 4, 2007.

For one to be equitably estopped, one must have taken actions "calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert." *McClure v. Wade*, 34 Tenn. App. 154, 171, 235 S.W.2d 835, 842 (1950). Waiver, on the other hand, is a voluntary relinquishment or renunciation of a known right. *Reed v. Washington County Bd. of Educ*., 756 S.W.2d 250, 255 (Tenn. 1988). We conclude that neither estoppel nor waiver apply here.

In short, the evidence does not show that Berkeley Park somehow misled Tabor into believing that the provisions of the mediated agreement no longer applied. On the contrary, Berkeley Park disagreed that the Proposed Agreement accurately reflected the parties' discussions on April 4, 2007, and responded by revising both the draft and the accompanying house plans and returning them to Tabor. Tabor acknowledged receipt of the plans on May 24, 2007, and the revised "agreement" at least by July. In September 2007, Tabor's counsel admitted doubt that there had been any meeting of the minds concerning the Proposed Agreement and noted that no order evidencing any final agreement had been prepared. Further, Tabor did not dispute Berkeley Park's assertions at trial that, in addition to its revisions to the Proposed Agreement and the revised plans submitted by Tabor, Markli had personally spoken with Tabor about the ongoing unapproved modifications in the construction of the Lot 59 house.

With regard to Tabor's waiver argument, we similarly find it to be without merit. All of the actions complained of occurred in the context of the pending contempt proceeding brought by Berkeley Park to enforce the Agreed Order and the specific provisions of the mediated agreement. Certainly, Berkeley Park did not waive its right to do so, as suggested by Tabor, by failing to "seek an additional injunction to stop construction pending resolution of any additional issues that developed on or after April 4, 2007 . . . ."

V.

A.

Again, the primary thrust of Tabor's appeal is that the mediated agreement incorporated into the Agreed Order was superseded. Tabor concludes that the disposition of the remaining issues based on his alleged violations of the mediated agreement are thus moot. In the alternative, however, Tabor challenges the trial court's findings that he violated specific provisions of the mediated agreement; to wit: (1) failure to obtain approval of his construction materials from the ACC; (2) failure to pay his homeowners' association dues;

-15-

(3) failure to hire a licensed architect for Lot 59 construction; (4) failure to obtain approval of plan modifications for Lot 59; and (5) failure to use a landscape plan generated by the approved Berkeley Park landscape architect.

As set out earlier in this opinion, the trial court found that each of these alleged violations of the 2006 Agreed Order was established by clear and convincing evidence at trial. On our review of the record, we conclude that the evidence does not preponderate against these findings of the trial court. We briefly address each finding in turn.

B.

The mediated agreement provided that "[Tabor] shall . . . submit the materials for approval to be used in the construction on Lot 59 to the ACC. No construction shall commence on Lot 59 until such materials are reviewed and approved by the ACC." Tabor asserts that the construction materials were in fact approved by the ACC as required. He relies on testimony by Mr. Markli to the effect that initially, "some materials" were submitted and approved. Markli added, however, that "all" materials were required to be submitted and approved and further, that after some materials, such as the proposed siding, were accepted, "then [Tabor] used something else." Tabor points to no other evidence to support his assertion that he complied with the Agreed Order in this regard, and we find none.

C.

The mediated agreement provided that Tabor would pay the outstanding homeowners' dues in satisfaction of the lien on Lot 59, plus all homeowners' dues current and outstanding on Lot 59 and all lots owned by him. At trial, at several points in his testimony, Tabor conceded he had not paid the required dues. He first attempted to establish that he was not obligated to pay the dues because he was erroneously informed by a Berkeley Park board member that he was a builder and not a member of the homeowners' association. Second, Tabor noted that one check he sent in payment of his dues was returned by Berkeley Park's treasurer. On the latter point, the proof established that Tabor's check, which he had submitted as "payment in full," was returned because it was less than the amount of the dues then owed. In any event, the trial court found that the dues were owed under the mediated agreement and, as admitted by Tabor, had not been paid. The evidence clearly establishes Tabor's violation of the Agreed Order, regardless of the reason.

D.

The mediated agreement required Tabor to hire a licensed architect to monitor and consult on the construction of the Lot 59 home and to make monthly progress reports to the

-16-

ACC. At trial, the architect eventually hired by Tabor testified that she was not licensed, but that state law did not require a license for residential architectural design. Moreover, the architect testified, as supported by documents in the record, that the monthly reports she prepared were sent directly to Tabor. The ACC testified that there was no contact with the architect and no receipt of any progress reports for the Lot 59 construction. The evidence clearly and beyond dispute established Tabor's violation of this provision.

E.

The mediated agreement provided that Tabor was to have any modifications to the approved plans to be approved by the ACC. Specifically, the agreement provides, in relevant part:

> Both Lots 59 and 39 shall comply with square footage requirements of the Covenants and Restrictions. Plans for Lot 39 and Lot 59 are approved and attached. However, *both parties agree that any modifications made to these plans (attached) must be reviewed and approved by the ACC*, including but not limited to the addition of square footage to the plans to comply with the Covenants and Restrictions.

(Emphasis added). At trial, Tabor's testimony regarding whether any modifications he made to the plans were later approved was less than clear. Tabor admitted that he took the approved original plans, submitted changes to them and "got them sent back." He agreed that he received a letter from the ACC advising him that the revised plans were "not approved." The record reflects that in September 2006, Berkeley Park wrote to Tabor informing him that the second set of revised plans "as submitted are not approved." Mr. Markli testified that while some modifications to the original plan were later approved, Tabor did not carry out those approved modifications: "[Tabor] went and did other things, and we have photographs here to . . . show that." In short, the evidence does not preponderate against the trial court's finding that Tabor failed to obtain ACC approval of modifications to the original plans.

F.

The mediated agreement provided that landscaping on Lot 59 must be in compliance with the covenants and restrictions and that the landscaping plan "must be generated by the Berkeley Park landscape architect." In his brief, Tabor asserts that he "cannot be in violation of the March 5, 2006 mediated settlement agreement when he could not comply [with] the requirement as he was prevented from doing so." Tabor refers to an October 1, 2007, letter

sent to him by Berkeley Park's counsel in response to Tabor's written request that he be provided "the name of this landscape designer." In response, Berkeley Park advised Tabor's counsel as follows: "In order for your client to have any landscaping approved, a landscape architect appointed by the ACC must be used. At this point, the ACC is not willing to proceed with any landscaping approval until such time that ALL other issues with the house are resolved." At trial, Tabor agreed that he "went ahead and landscaped," using a landscaper he hired himself, after receiving the October 1 letter. The evidence does not preponderate against the trial court's finding of a violation on this point.

## VI.

Next, the trial court rejected Tabor's claim that Berkeley Park acted unreasonably in its dealings with him regarding the construction of the Lot 59 house – the court found "clear and convincing evidence that the demands by [Berkeley Park] were reasonable and necessary under the [Agreed Order]." Tabor contends that the trial court's finding is erroneous because, as Tabor sees it, Berkeley Park went out of its way to target his efforts to complete the project by continuously changing its demands and raising new complaints about his work. Berkeley Park responds that Tabor was the "architect" of his own problems because he continued to build in violation of the provisions of the mediated agreement. As he did so, more problems were created.

We conclude that the evidence does not preponderate against the trial court's finding that Berkeley Park acted reasonably in its attempts to enforce the provisions of the Agreed Order. Upon our review of the entire record, we must agree that Tabor was responsible for the seemingly endless problems he faced in completing construction. As discussed, Tabor purchased Lot 59 in October 2004. Some five months later, at the earliest stages of construction, the ACC first wrote Tabor to inform him that the lot "can not be altered in any way" without first submitting plans and receiving approval for the planned structure from the ACC. In a May 2005 letter, the ACC, through counsel, notified Tabor that he was proceeding to construct the Lot 59 house at his own risk:

> On lot 59, you have taken the initial steps to start construction of a house without attaining approval of the [ACC] of the plans . . . or posting the $3,000.00 construction bond required by the covenants and restrictions. No work should be done on said lot until the plans are approved and the bond is posted. If construction proceeds, the covenants and restrictions provide that an injunction can be sought to stop any construction . . . .

In August 2005, Berkeley Park notified Tabor that he was no longer an approved builder in the subdivision and that it would take immediate action to stop any unauthorized construction by Tabor. The following month, Berkeley Park proceeded to court to obtain an injunction against the continued construction of the house in violation of the covenants and restrictions.

While this history obviously predates the mediated agreement and the Agreed Order, we think it is instructive regarding the manner in which Berkeley Park dealt with Tabor throughout this case. Certainly, Berkeley Park repeatedly informed Tabor that he was required to proceed in compliance with the governing covenants and restrictions. Later, it blocked any efforts to proceed with unapproved modifications to the approved plans, including through court actions. In January 2007, Berkeley Park filed the instant contempt motion after Tabor recommenced construction of the house without complying with express provisions of the Agreed Order. Even then, however, Berkeley Park made efforts to address the deficiencies it observed as Tabor continued construction of the house without having modifications approved as required.

As Tabor describes it, Berkeley Park harassed him from start to finish of the project; while Berkeley Park insists that it acted to counter Tabor's "reckless and haphazard disregard for restrictive covenants, mediated agreements, and court orders." The trial court heard the testimony and decided this issue in favor of Berkeley Park. "With respect to a trial court's findings of credibility and the weight given to oral testimony, we accord considerable deference in those circumstances on review because the trial court has the opportunity to observe the witnesses' demeanor and hear the in-court testimony." *Interstate Mech. Contractors, Inc. v. McIntosh*, 229 S.W.3d 674, 678 (Tenn. 2007)(citing *Tobitt v. Bridgestone/Firestone, Inc*., 59 S.W.3d 57, 61 (Tenn. 2001); *McCaleb v. Saturn Corp*., 910 S.W.2d 412, 415 (Tenn. Workers' Comp. Panel 1995)). "The trial court's findings on credibility and weight of the evidence may be inferred from the manner in which the court resolves the conflicts in the testimony and decides the case." *Id*. (citing *Rhodes v. Capital City Ins. Co.*, 154 S.W.3d 43, 46 (Tenn. 2004)).

Again, our review of non-jury cases is de novo upon the record, accompanied by a presumption of correctness, unless the evidence preponderates against the trial court's factual findings. See Tenn. R. App. P. 13(d). In the present case, the evidence does not preponderate against the trial court's finding that Berkeley Park made reasonable and necessary demands on Tabor to enforce the provisions governing the construction of the Lot 59 house.

VII.

Finally, Tabor submits that the trial court erroneously concluded that Berkeley Park was entitled to exercise its remedies under the covenants and restrictions to receive an award

of its attorney's fees and costs in this action. In this regard, Tabor simply reasserts his position that the parties reached a new agreement governing construction of the home in April 2007; therefore, according to Tabor, there is no basis for an award of fees and costs for violations of the prior mediated agreement.

Tabor's argument is to no avail. Earlier in this opinion, we upheld the trial court's finding that there was no superseding agreement established. Pursuant to Article XII of the covenants and restrictions, Berkeley Park is expressly provided the right to enforce its remedies to abate any violations or breaches of its restrictions. Further, Article XII, Section 1 (c) provides as follows:

> If [Berkeley Park], the [ACC], the Board or any other person . . . owning a Lot shall successfully prosecute in law or equity any action pursuant to this or any other enforcement section of these covenants or restrictions, then that party shall be entitled to receive its reasonable attorney's fees and the costs reasonably necessary to prosecute the case against the party violating the covenants and restrictions herein.

The trial court did not err in awarding attorney's fees and costs to Berkeley Park in this case pursuant to the covenants and restrictions. This issue is without merit.

VIII.

The judgment of the trial court is affirmed. Costs on appeal are taxed to the appellants, John Tabor and Tabor Construction, Inc. This case is remanded to the trial court, pursuant to applicable law, for enforcement of that court's judgment and the collection of costs assessed below.

_____
CHARLES D. SUSANO, JR., JUDGE